Murray HELLER, Personal Representative of the Estate of Jo Hixson (by substitution for Jo Hixson, successor in interest to Hixson Trade Shows, Ltd., f/k/a Trade Shows, Ltd., a California corporation), Plaintiff–Appellee and Cross–Appellant,

v.

LEXTON–ANCIRA REAL ESTATE FUND, LTD., 1972, a California limited partnership, Lexton–Ancira Incorporated, a Kansas corporation, Merchandise Mart Associates, Ltd., a Colorado limited partnership, and Darrell R. Hare, Defendants–Appellants and Cross–Appellees.

No. 88CA1499.

Colorado Court of Appeals, Div. III.

July 5, 1990.

Rehearing Denied Aug. 23, 1990.

Certiorari Granted May 6, 1991.

Holland & Hart, John S. Castellano, Timothy M. Rastello, Denver, for plaintiff-appellee and cross-appellant.

Waller, Mark & Allen, P.C., William C. Waller, Jr., Kevin D. Allen, Baker & Hostetler, Bruce D. Pringle, Joan D. Burleson, Denver, for defendants-appellants and cross-appellees.

Opinion by Chief Judge STERNBERG.

The defendants, Lexton–Ancira Real Estate Fund, Ltd. 1972, Lexton–Ancira Inc., Merchandise Mart Associates, Ltd., and Darrell R. Hare (the Mart), appeal judgments entered on jury verdicts against them and in favor of Jo Hixson, successor-in-interest to Hixson Trade Shows, Ltd. We affirm in part, reverse in part, and remand with directions.

Hixson Trade Shows, Ltd. (plaintiff) was in the business of promoting gift and jewelry shows. It leased show space in hotels or exhibition facilities about one week once or twice per year, with space then subleased to exhibitors. The company also conducted promotional activities for the shows.

The "Denver Gift and Jewelry Show" was first held in the 1940's and was acquired by the plaintiff in the mid–1950's. Jo Hixson's late husband acquired all the company's stock in the late 1960's and early 1970's. When he died in 1978, Jo Hixson became actively involved in the company, owning all its stock during the times material here.

In 1966, the plaintiff first negotiated a lease with the Denver Merchandise Mart. On August 21, 1975, the parties signed a new lease, which provided for a term of ten years, with three five-year options to renew. The renewal option required written notice to the Mart at least two years prior to the lease's expiration. The lease provided, "The trade style or name 'Denver Gift & Jewelry Show' shall remain the property of the [plaintiff]."

As early as April 5, 1978, there was correspondence from the Mart to the plaintiff reserving show dates through 1990. However, the plaintiff did not provide written notice of renewal of the lease, and on August 2, 1985, less than three weeks prior to the last of the company's shows under the lease, the Mart, by letter from Darrell R. Hare, general manager, notified the plaintiff that the lease between the parties was expiring. The letter indicated that the Mart would produce its own gift shows commencing in 1986.

By notice to show exhibitors dated August 21, 1985, the Mart announced that it would "sponsor, promote and direct its own gift and jewelry shows commencing in March 1986. This August gift show will conclude a long relationship with [Hixson] Trade Shows, Ltd., out of California. All future gift shows at the Mart will be known as the DENVER MERCHANDISE MART GIFT & JEWELRY SHOWS."

The plaintiff then scheduled the Denver Gift and Jewelry Show at the Denver Coliseum two weeks earlier than the Mart's show in March 1986, which was utilizing the dates originally reserved for the company's show. This show was not successful, nor was another that it held at the Coliseum in August 1986, on the same show dates as the Mart's. Four months later,

after this action was initiated but prior to trial, the plaintiff was dissolved and all the assets were distributed to Jo Hixson.

The plaintiff sued the Mart, alleging breach of the lease, misappropriation and conversion, intentional interference with prospective advantage, breach of duty of good faith and fair dealing, misrepresentation, unfair competition, and bad faith. The claim for breach of the duty of good faith was dismissed. The Mart counterclaimed for defamation and successfully sought to join Jo Hixson individually as an involuntary plaintiff and counterclaim defendant.

The trial court granted summary judgment for the Mart on the misrepresentation and conversion claims. Before trial, the court permitted the plaintiff, who by that time was Jo Hixson, as successor-in-interest to the company, to present a claim for fraudulent nondisclosure, after she successfully argued that it was contained within the allegations of the complaint. Hixson submitted a trial data certificate which indicated that a claim for deceptive trade practices under the Colorado Consumer Protection Act, § 6–1–101, et seq., C.R.S. (1973 Vol. 2) (the Act), would be relied upon as a legal theory for a claim of "unfair competition."

After a lengthy trial, the jury returned verdicts in favor of the defendants on the claims for breach of contract, fraudulent nondisclosure, and intentional interference with business relationship. However, the jury found in favor of Hixson on the deceptive trade practices claim, on the misappropriation claim, and on the defendants' defamation counterclaim. Hixson had abandoned her claims for unfair competition and breach of fiduciary duty during the trial.

Damages were assessed by the jury at $2 million each on the deceptive trade practices claim under the Act and the misappropriation claims, along with $2 million in punitive damages. The trial court calculated the damages as $6 million, treble damages required by § 6–1–113(2)(a), C.R.S. (1989 Cum.Supp.) for violation of the Act, plus $2 million on the misappropriation claim and $2 million in punitive damages, for a total

of $10 million. Then, because it found that the $2 million misappropriation damages "may" be duplicative of those awarded under the Act, the court reduced the damages to $8 million, entering judgment for that amount plus attorneys fees and costs.

Following the filing by the defendants of a motion for new trial or for judgment notwithstanding the verdict, the trial court concluded that the punitive damages awarded under the misappropriation claim overlapped the treble damages under the Consumer Protection Act claim; therefore, it reduced the judgment to $6 million, plus attorneys fees and costs. This appeal and cross-appeal followed.

Jo Hixson died on January 3, 1990, during the pendency of this appeal, and by leave of this court her personal representative, Murray Heller, was substituted as plaintiff.

## I.

■ On appeal, the defendants first contend that the judgment on the claim for misappropriation must be reversed. Analysis of the claims and evidence presented at trial shows that the plaintiff pursued two different claims for "misappropriation," one for misappropriation of trade name and one for misappropriation of "business values."

### A.

We address first the defendants' contention that the jury instructions and special verdict forms used by the trial court to query the jury on the issue of trade name misappropriation were defective as a matter of law. The defendants argue, and we agree, that for a trade name to be misappropriable, it must have acquired a secondary meaning, *see Wood v. Wood's Homes, Inc.*, 33 Colo.App. 285, 519 P.2d 1212 (1974). They then assert that because of the jury instructions and special verdict forms used here, it is not possible to tell whether the jury concluded that the plaintiff's trade name "The Denver Gift and Jewelry Show" had acquired secondary meaning.

In an instruction quoting verbatim from *United States Bank v. Mesa United Bank*, 41 Colo.App. 552, 595 P.2d 259 (1978), the jury was given a correct definition of "secondary meaning" as follows:

"A name has acquired secondary meaning if it is shown that by prior and continuous use of a name for a long period of time the public mind identifies the user of the name with the particular service or goods furnished by him and thereby identifies the product by the name. Factors to be considered in ascertaining whether a secondary meaning has been established include the length of time the trade name has been in use, the amount of advertising expended on promotion of the name, and the growth of the business to which the trade name refers."

The special verdict making specific reference to the question of misappropriation of trade name read:

"Did defendants' use of the trade name unfairly cause confusion or mistake, or deceive purchasers or prospective purchasers as to the source, origin or sponsorship of defendants' show, or lead purchasers to believe they were doing business with Hixson?"

C.R.C.P. 49(a) requires that a jury return a special written finding "upon each issue of fact." Here, when read alone the language of this special verdict form does not necessarily lead to the conclusion that the jury found that the plaintiff's trade name had acquired secondary meaning; however, when read with the other verdict forms it is apparent that the jury concluded the name had acquired a secondary meaning. In any event, the judgment for misrepresentation is supported by the jury's verdict on the business value claim which is discussed in Part B.

### B.

■ The defendants next assert that, as a matter of law, there can be no application of the doctrine of misappropriation of business values. We do not agree.

### 1.

The defendants argue that there are no legally protectable interests in a trade show organized and promoted in a specific manner, held at a specific location on specific dates, and frequented by specific buyers and exhibitors. Under the circumstances present here, we disagree.

In *American Television & Communications Corp. v. Manning*, 651 P.2d 440 (Colo.App.1982), this court recognized the common law torts of "unfair competition and misappropriation." In discussing unfair competition, the *Manning* court quoted from *International News Service v. Associated Press*, 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211 (1918) which noted that the tort was present because material was acquired "as the result of organization and the expenditure of labor skill and money and which is saleable by [a plaintiff] for money."

The jury in this case heard evidence of the amount of promotional time and money expended by Hixson through the years. In addition, after the Mart began running its show in 1986, it used the plaintiff's advisory committee, floor plan, fee structure, seniority system, and program format. We hold that these facts are sufficient to serve as an evidentiary basis for the jury's conclusion that the defendants appropriated the plaintiff's expenditure of labor, skill, and money; thus, the case law criteria for the tort of misappropriation of business value are met.

### 2.

■ The defendants also argue that the jury instruction on misappropriation was inconsistent with the special verdict forms. We find no error in this regard.

The Mart notes that the third paragraph of the instruction in question is stated in the conjunctive ("defendants unfairly profited from Hixson's business organization ... and capitalized on the commercial value that Hixson earned....") and the special verdict form is in the disjunctive ("[D]id defendants wrongfully profit from Hixson's expenditure of labor, skill and money ... or wrongfully capitalize on the commercial value that Hixson ... had earned over the years....").

We view the tort of "unfair misappropriation" as occurring when one either wrongfully profits from another's expenditure of labor, skill or money, or capitalizes wrongfully on commercial values earned over a period of time. The two are alternate methods of committing the tort. *See American Television & Communications Corp. v. Manning, supra; c.f., International News Service v. Associated Press, supra.* Thus, the inconsistency between the instruction and special verdict form did not prejudice the defendants.

### 3.

■ The defendants next assert that, because only special verdict forms and instructions were used without any general verdict on this claim, the jury failed to make findings on its essential elements. We disagree.

This case was submitted to the jury using only special verdict forms, without general verdict forms. In pertinent part, C.R.C.P. 49(a)· provides:

"The court may require a jury to return only a special verdict in the form of a special written finding upon each issue of fact. In that event the court may submit to the jury written questions susceptible of categorical or other brief answer or may submit written forms of the several special findings which might properly be made upon the pleadings and evidence; or it may use such other method of submitting the issues and requiring the written findings thereon as it deems most appropriate."

■ C.R.C.P. 49(a) does not require a submission of a question on each issue if all the issues are fairly submitted to the jury through a combination of special verdicts and instructions. *Reorganized Church of Jesus Christ v. U.S. Gypsum Co.*, 882 F.2d 335 (8th Cir.1989); *Bryan v. Cargill, Inc.*, 723 F.2d 1202 (5th Cir.1984) ("No party is entitled to a special verdict on each of the multi-faceted, multitudinous is-

sues essential to the resolution of a given case.").

Because the special verdict form correctly presented the claim for misappropriation of business values, which the jury answered in the affirmative, we conclude that there was no error in this regard.

### 4.

■ The defendants next argue that the jury was erroneously instructed that liability for misappropriation can be predicated upon creation of the impression that the Mart's show superseded the plaintiff's. They argue that the term "superseded" was not defined, and the jury could have made an affirmative finding merely because the defendants truthfully told exhibitors that after December 1985, they would be producing the show themselves.

■ Jury instructions should be couched in language clearly understandable, rather than in unusual terms leading to guesswork and speculation on the part of the jurors. *Panhandle Pipe & Supply Co. v. Pressey & Son*, 125 Colo. 355, 243 P.2d 756 (1952).

We hold that the term "superseded" is one which is understandable to jurors, and therefore, we do not perceive error in its use. Furthermore, in the context of the claim for deceptive trade practice, the jury found that the Mart "[k]nowingly pass[ed] their gift and jewelry show off as that of Hixson" and that the Mart "knowingly [made] a false representation as to the affiliation, connection, sponsorship, or association of Hixson with their gift and jewelry show." In light of these findings by the jury, we hold that the jury could not have made the finding suggested by the defendants; therefore, their contention must fail.

### II.

■ The defendants next contend that the verdict finding them liable under the Consumer Protection Act, § 6–1–101, et seq., C.R.S., cannot stand. We do not agree.

### A.

The defendants argue that the plaintiff lacked standing to assert claims under the Act.

Section 6–1–113(1), C.R.S. (1989 Cum. Supp.) provides: "The provisions of this article shall be available to any person in a civil action for any claim against any person who has engaged in or caused another to engage in any deceptive trade practice...." Under the Act, "person" is defined as "an individual, corporation, business trust, estate, trust, partnership, unincorporated association, or two or more thereof having a joint or common interest, or any other legal or commercial entity." Section 6–1–102(6), C.R.S.

Contrary to the defendants' contention, we hold that Hixson did have standing to bring a claim because the definition of "person" specifically includes a corporation. We do not agree with the holding in *United States Welding, Inc. v. Burroughs Corp.*, 615 F.Supp. 554 (D.Colo.1985), which held that consumers are intended beneficiaries of the Act and thus businesses do not have standing.

### B.

■ Defendants also argue that plaintiffs did not plead the claim under the Act, raising it, rather, for the first time in the trial data certificate. Additionally, defendants assert that an action under this Act requires that the allegation be pleaded specifically pursuant to C.R.C.P. 9(b). We disagree.

■ To the contrary, we agree with the plaintiff that, even under C.R.C.P. 9(b), it is sufficient to state the main facts constituting the fraud. *Fidelity Finance Co. v. Groff*, 124 Colo. 223, 235 P.2d 994 (1951). Here, the amended complaint adequately sets forth the facts which put the defendants on notice of a claim under the Act, and the record reveals that numerous affirmative defenses were asserted. Thus, there was no error.

## C.

██ The defendants next contend that the special verdict form on deceptive trade practices was defective as a matter of law because there was no definition of the term "passing off." We disagree.

The record reveals that there was only a special verdict form relating to the Act; no other instructions or definitions concerning it were provided to the jury.

As in effect at the time the complaint was filed, § 6-1-105(1), C.R.S., provided:

"A person engages in a deceptive trade practice when, in the course of his business, vocation, or occupation, he:

"(a) Knowingly passes off goods or services as those of another;

"(b) Knowingly makes a false representation as to the source, sponsorship, approval, or certification of goods or services;

"(c) Knowingly makes a false representation as to affiliation, connection, or association with or certification by another...."

The special verdict form on deceptive trade practices read:

"Did defendants do any of the following:

"1. Knowingly pass their gift and jewelry show off as that of Hixson Hixson [sic]?

"2. *or* knowingly make a false representation as to the source, or sponsorship of their gift and jewelry show?

"3. *or* knowingly make a false representation as to the affiliation, connection, sponsorship, or association of Hixson with their gift and jewelry show?" (emphasis added)

The defendants assert that the jury should have been specifically instructed on the elements of a claim for "passing off," which they contend to be conduct by which a defendant creates a likelihood that consumers will believe its products are those of another, intent to deceive consumers as to the source of the products, consumer confusion caused by a defendant's actions, and damages. They also argue that "passing off" is a term of art that requires a definition to the jury. We do not agree with either contention.

We hold that the phrase "passing off" as used in the Act is sufficiently plain in its meaning as to need no sophisticated definition. *See Panhandle Pipe & Supply Co., supra.* Furthermore, instructions phrased in the language of the statute, as here, are not erroneous when, read together, they adequately inform the jury of the applicable law. *See Blincoe v. People,* 178 Colo. 34, 494 P.2d 1285 (1972). Therefore, we find no error in this instruction.

## D.

██ The defendants argue that there was insufficient evidence to support a finding of deceptive trade practices. We disagree.

The jurors heard evidence that the Mart chose a very similar name for its show while rejecting other choices, that it used the show dates which had been reserved for Hixson as early as 1978, and that it used Hixson's floor plan, fee structure, seniority system, and floor plan. They further heard evidence of confusion among some exhibitors and attendees regarding the show's sponsorship. We hold that, when reviewed as a whole, the evidence was sufficient for the jury to conclude that deceptive trade practices had occurred; thus, the jury's findings are binding on appeal. *Page v. Clark,* 197 Colo. 306, 592 P.2d 792 (1979).

## E.

██ The defendants next contend that it was error not to instruct the jury on the elements of a claim for deceptive trade practice, but merely to use special verdict forms. Again, we are not persuaded.

Because we hold that the phrase "passing off" as used in the Act is sufficiently plain in its meaning as to need no sophisticated definition, *See Panhandle Pipe and Supply Co., supra,* and because the instructions were phrased in the language of the statute, *see Blincoe v. People, supra,* we conclude that there was no error.

### III.

The defendants raise contentions of error relating to damages. We affirm the jury's damage awards.

#### A.

Defendants first argue that the record establishes that plaintiff suffered no damages as a result of conduct which the jury found to be wrongful, and that the damage award must be vacated because it is based on assumptions which were rejected by either the court or the jury. We do not agree.

The record reveals that plaintiff's sole witness on damages was a certified public accountant. He initially arrived at a damage figure of $1.6 to $2 million, and detailed for the jury four assumptions that went to his calculation. In rebuttal testimony, the accountant recalculated the damages at $1.5 million using three different assumptions. In addition, the jury heard his testimony to the effect that, in addition to the plaintiff's losses, the Mart's gain was between $3.9 and $4.7 million by virtue of its running the trade show itself.

The defendants complain that the accountant made no attempt to allocate the damages that were attributable to each assumption, and they rely on *Norfolk & Western Ry. Co. v. United States Ry. Equipment Co.*, 563 F.Supp. 747 (N.D.Ill. 1983), *aff'd without opinion*, 753 F.2d 1078 (7th Cir.1985), for the proposition that because several of his assumptions were rejected either by the court or the jury, the damage award cannot stand.

The assessment of damages is within the exclusive province of the jury. *Tighe v. Kenyon*, 681 P.2d 547 (Colo.App. 1984). We conclude that the measure of damages for misappropriation of business values or for deceptive trade practices includes full compensation to the plaintiff for its lost profits as well as an award for all of the defendant's profits realized as a result of the tortious conduct. *See Mineral Deposits, Ltd. v. Zigan*, 773 P.2d 606 (Colo.App.1988) (measure of damages for misappropriation of trade secrets entitles plaintiff to recover full compensation for lost profits and requires defendant to surrender profits realized from the tortious conduct).

There was competent, though disputed, evidence of both the plaintiff's loss and the defendants' gains in which the assumptions were laid out for the jury, and the testimony was subject to cross-examination. Further, unlike *Norfolk & Western Ry. Co.*, *supra*, an analysis of the testimony in question shows that it was not "fatally flawed" in that not all of the assumptions on which the expert relied were specifically rejected. Therefore, we hold that there was a proper basis as well as sufficient evidence from which the jurors could find the damages they awarded.

#### B.

Finally, the defendants contend that the damages awarded must be reversed because the trial court erred in allowing evidence of the net worth of the Mart's parent company.

Over the defendants' objection, the trial court permitted introduction into evidence of a consolidated balance sheet of the Mart's parent company, showing assets of over $2 billion. This fact was also noted during the plaintiff's closing argument.

The record reveals that the defendants produced the consolidated balance sheet in response to the trial court's order to produce a financial statement. The defendants produced only the consolidated balance sheet; no separate financial statement was provided. After the exhibit was introduced, the plaintiff agreed to withdraw it, and the jury was instructed to disregard any reference to the parent corporation's wealth.

Since on review it will be presumed that the jury, in reaching its conclusions, followed the court's instruction, *James v. James*, 85 Colo. 154, 274 P. 816 (1929), we hold that no prejudice to the defendants resulted. We therefore need not decide the propriety of the jury hearing evidence of the parent company's net worth. *See also Montgomery Ward & Co. v. Andrews*, 736

P.2d 40 (Colo.App.1987) (no reversible error where the trial court instructed the jury to disregard a reference to the defendant's parent company in an annual report).

## IV.

On cross-appeal, the plaintiff raises issues relating to damages and the claim for breach of contract.

### A.

The plaintiff first contends that the trial court erred when it reduced the $10 million judgment by $2 million because of its conclusion that the $2 million damages for misappropriation and $2 million damages for deceptive trade practices under the Act were duplicative. We agree.

The Act itself provides: "The deceptive trade practices listed in this section are in addition to and do not limit the types of unfair trade practices actionable at common law or under other statutes of this state." Section 6-1-105(3), C.R.S. This statement evinces the clear intent of the General Assembly, which must be the polestar of statutory interpretation. *People v. District Court*, 711 P.2d 666 (Colo.1985).

Because there was evidence presented from which a jury could conclude that damages were at least $4 million, which is what the jury awarded ($2 million for the misappropriation claim and $2 million for the deceptive trade practices claim), and because of the language of the Act itself, we agree that it was error for the trial court to find these two claims to be duplicative.

### B.

The plaintiff next contends that the trial court erred in concluding that the treble damages awarded under the Act were duplicative of the $2 million punitive damage award by the jury. Again, we agree.

The defendants cite *Arnott v. American Oil Co.*, 609 F.2d 873 (8th Cir. 1979), *cert. denied*, 446 U.S. 918, 100 S.Ct. 1852, 64 L.Ed.2d 272 (1980) (construing the Sherman Anti-Trust Act, 15 U.S.C. § 1, et seq.1988) and other cases for what they contend is the universal rule that punitive damages and treble damages under a statute are duplicative for claims based on the same facts. However, we note that, in Colorado, the award of punitive damages has as its primary goals punishment and deterrence. *Mince v. Butters*, 200 Colo. 501, 616 P.2d 127 (1980). We further note that the jury awarded the $2 million punitive damages specifically on the misappropriation claim.

We conclude that, because the damage awards serve different purposes, an award of punitive damages arising from the same facts that give rise to liability under the Act for deceptive trade practices is not precluded when these statutory treble damages are awarded. Thus, it was error for the trial court to find them duplicative. *See also Williams v. Farmers Insurance Group, Inc.*, 781 P.2d 156 (Colo.App.1989) (statutory treble damages under the Colorado Auto Reparations Act, § 10-4-701, et seq. (1987 Repl.Vol. 4A), do not preempt recovery of damages for bad faith breach of an insurance contract).

### C.

The plaintiff next contends that the trial court erred when it removed the breach of contract claim from the jury. We do not agree.

The plaintiff's position at trial was that, if Hixson Trade Shows had failed to comply with the renewal provisions of the lease, it should have been given the opportunity to cure under the terms of the lease.

That portion of the lease provides:

"Any of the following events shall constitute a default by [Hixson Trade Shows] of this Lease:

. . . .

"[Hixson Trade Shows] fails in the performance of or compliance with any of the covenants, conditions, agreements, terms or provisions contained in this Lease and such default continues for a period of twenty-four (24) hours after notice thereof from [the Mart]; provided

that in connection with a default not susceptible of being cured with due diligence with [sic] (24) hours, the time of [Hixson Trade Shows] within which to cure the same shall be extended for such time as may be necessary to cure the same with all due diligence, provided [Hixson Trade Shows] commences promptly and proceeds diligently to cure the same...."

While the plaintiff correctly notes that an ambiguity in a key contractual issue must be submitted to the jury as an issue of fact, *Pepcol Manufacturing Co. v. Denver Union Corp.*, 687 P.2d 1310 (Colo.1984), we perceive no ambiguity in this lease term. Furthermore, the right to extend a lease must be strictly adhered to in order to enforce the exercise of that right. *Buckley Brothers Motors, Inc. v. Gran Prix Imports, Inc.*, 633 P.2d 1081 (Colo.1981). A unilateral option is not an affirmative contractual obligation on the part of the lessee. *Analytical Design & Construction Group, Inc. v. Murray*, 690 P.2d 269 (Colo.App.1984).

The record indicates that upon notice by the Mart of the expiration of the lease in 1985, Hixson Trade Shows did not attempt to cure within 24 hours. We therefore conclude that the trial court was correct in ruling that the breach of contract claim was not within the province of the jury.

### D.

The plaintiff's other contentions on cross-appeal are without merit.

The judgment is affirmed except as to the damage award; in that regard, the cause is remanded to the trial court with directions to reinstate the $2 million damage award for punitive damages, and the $2 million damage award for the misappropriation claim.

PLANK and NEY, JJ., concur.