**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**April 26, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

KLESCH & COMPANY LIMITED,

    Plaintiff-Counter-
    Defendant - Appellant,

    v.

LIBERTY MEDIA CORPORATION;
JOHN C. MALONE; ROBERT R.
BENNETT,

    Defendants-Counter-
    Claimants - Appellees.

No. 05-1206

(D. Colorado)

(D.C. No. 01-D-1456 (CBS))

**ORDER AND JUDGMENT**[*]

Before **HARTZ**, **O'BRIEN**, and **McCONNELL**, Circuit Judges.

Claiming that Liberty Media Corp. expropriated a valuable business

opportunity, Klesch & Company, Ltd., brought a diversity action in the United

States District Court for the District of Colorado. Klesch lost at trial and now

appeals, challenging the court's instructions (1) that the jury could not award

damages to Klesch under the last of several successive written agreements signed

[*]This order and judgment is not binding precedent except under the
doctrines of law of the case, res judicata, and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

by Klesch and Liberty Media; (2) that Klesch's misappropriation claim required proof that Liberty Media had profited from the misappropriation; and (3) that Liberty Media would be liable for damages only if it was a but-for cause of those damages. We have jurisdiction under 28 U.S.C. § 1291 and affirm.

I.    BACKGROUND

A.    The Parties' Relationship

The claims in this case arise out of separate, successive agreements whose force the parties disputed at trial. The agreements concern the parties' potential acquisition of German cable companies.

In 1999 Deutsche Telekom, which owned the cable infrastructure in Germany, planned to split responsibility for this infrastructure among nine new regional companies to be auctioned to third parties. Klesch, a private-equity firm, bought one regional company in August 2000. Earlier that year it had also acquired the exclusive right to negotiate for two other regional companies. To solicit funds to invest in these companies, Klesch took steps to form Capital Communications Partners (CCP).

In October 2000 Klesch met with Liberty, which held interests in various communications, internet, and video-programming companies, to discuss investing in the regional companies; but Liberty did not commit to any investments at that time. Despite some uncertainty about the investors it might be able to line up, Klesch bid for the two regional companies in January 2001. By

then it had become aware that Telekom might be willing to sell all six yet-unsold regional companies to a single buyer. This possibility appears to have sparked Liberty's interest in the deal. At a meeting in February 2001 Klesch told Liberty that it expected that a 55% interest in the remaining six regional companies would be sufficient to exercise control of them. Klesch and Liberty began discussing the acquisition of the German companies, and they agreed to explore the possibility of jointly acquiring all remaining companies.

On February 11 Liberty sent an email to Klesch to the effect that the lawyers should start drafting a written contract. Two days later Liberty sent a letter proposing its involvement in CCP, describing anticipated agreements, and conditioning future involvement on such things as regulatory approval, financial due diligence, and Liberty's future acceptance of "definitive documentation." Aplee. Supp. App. Vol. IV at 1168.

On February 16 Klesch and Liberty entered into a confidentiality agreement preventing Liberty for two years from using Klesch's private information to seek its own deal with Telekom for the six remaining regional companies. A second agreement on February 21 imposed two obligations through June 30, 2001: (1) Liberty could not contact Telekom without Klesch's written permission; and (2) neither party could seek without the other a deal concerning the six regional companies. In addition, Liberty agreed to notify Klesch if it decided not to

pursue the six companies through CCP, upon which notification the agreement would terminate.

The parties signed a letter of intent the next day, February 22. That letter outlined the proposed deal, under which CCP would acquire a 55% interest in the six regional companies and an option to acquire additional interests. The letter stated that there was still no definitive agreement between the parties. Klesch soon began to share with Liberty confidential information relating to the deal.

On March 16 the parties signed a document (the Term Sheet) setting forth their "understanding of the business arrangement." Aplt. App. Vol. VI at 1705. This document set forth the basic terms of the proposed deal, in which Klesch and Liberty would become equal partners in CCP, which would be the general partner of another entity formed to acquire the German companies. But the acquisition was still premised on the condition that all its aspects "will be acceptable to both Klesch and Liberty." *Id.* at 1706.

The first signs of trouble seem to have come shortly thereafter. Liberty asserts that it had signed the Term Sheet based on the assumption that a 55% interest would provide adequate control of the regional companies. Through its own investigations, however, it found that this was not the case under German law. Liberty contends that the deal was not worthwhile without a controlling interest and that it had determined that it would be necessary to purchase at least 75% of the equity interest in the regional companies for the level of control it

sought. During negotiations on April 17 such a purchase apparently was not acceptable to Telekom. But on April 25 Telekom agreed to sell 75% if Liberty agreed to a put that would require it to buy the remaining 25% at the same price upon Telekom's demand. Klesch was later to argue that Liberty unfairly accepted this proposal on its own, without consulting Klesch.

Contending that it had substantially increased its commitment and risk in the deal, Liberty sought to change its relationship with Klesch. Klesch consented to revise their agreement in May 2001. To allay Klesch's concern about repeated revisions, Liberty's president stated that no further changes in the deal between Liberty and Klesch were anticipated absent further changes in the deal with Telekom.

Later in May Liberty's executive committee decided that the deal was unfair to Liberty, given that Liberty's commitments had risen substantially but Klesch's had not. Liberty's president notified Klesch that "no transaction . . . would be acceptable [to us] without a lower level of guaranteed payments to you." Aplee. Supp. App. Vol. IV at 1179. It wished to characterize payments to Klesch as a finder's fee or as consulting payments, rather than as payments to an equity partner, and insisted that Klesch would "not participate in governance." *Id.* In a later phone call the parties appear to have been unable to reach an agreement, and Liberty insisted that it could not proceed with the deal on the

terms Klesch demanded. When Klesch suggested that it might raise further funds to support the transaction, Liberty agreed that that might be acceptable.

Before this phone call Liberty had begun to communicate with Telekom directly, putatively for the purpose of retaining Telekom's good will and giving it updated information. At trial Liberty's intent in these discussions was disputed.

Liberty and Klesch continued their negotiations, and on May 17, 2001, Klesch appears to have agreed in principle to substantially changed terms. On May 24 Klesch's investment banker sent Klesch a letter suggesting that the value to Klesch of the March 16 terms and the new terms were comparable. Klesch and Liberty negotiated and signed a new agreement on June 7. One of the final disagreements before the agreement was signed was whether it was to be binding. Liberty appears initially to have wanted flexibility and not to be bound by the new agreement; Klesch wanted the agreement to be binding and advised Liberty that it would consider court action if the parties could not reach a binding agreement. The final agreement contained a provision requiring good-faith negotiations to reach a definitive agreement; if these negotiations did not lead to a deal and Liberty were to purchase the six Telekom regional companies by itself before June 7, 2003, Liberty promised to pay Klesch 3% of the value of the acquired assets, up to 165 million euro. The new agreement explicitly superseded the March 16 agreement "in its entirety," Aplt. App. Vol. IV at 1712, but it stated

that nothing else in it was binding except the provision requiring good-faith negotiation to reach a definitive agreement.

The negotiations between Klesch and Liberty called for by the June 7 agreement did not succeed. On June 21, 2001, Liberty agreed with Telekom on terms by which it would acquire the six regional companies directly from Telekom. On July 24 Liberty sent a letter to Klesch stating that "Liberty Media is not now, and has never been, a partner with you or your company." Aplt. App. Vol. I at 33. Klesch filed suit on July 27, 2001, contending that Liberty had "utterly failed and refused to negotiate with Klesch in good faith" toward a final agreement. *Id.* at 49.

On September 3, 2001, Liberty and Telekom signed an agreement for Liberty to acquire the six regional companies. But the German Cartel Office quashed the deal on February 28, 2002, and Liberty and Telekom abandoned the acquisition shortly thereafter.

## B. Litigation

Klesch's complaint set forth a number of claims under Colorado law: breach of contract, promissory estoppel, breach of fiduciary duty, fraud, negligent misrepresentation, misappropriation of business value, tortious interference with economic advantage, and unjust enrichment. The gist of the complaint was that Liberty pursued negotiations with Telekom in violation of its agreements with Klesch and unilaterally changed the terms of those agreements. Klesch claimed

that after using Klesch's unique skills and information related to the deal, Liberty seized the opportunity to acquire the six regional companies for itself, thereby freezing Klesch out of the deal and failing to treat Klesch as an equal partner despite prior agreements and fiduciary duties.

Liberty's first amended answer and counterclaim, dated October 23, 2002, contended that Klesch's claims were barred by the terms of the June 7 agreement and sought a declaratory judgment that Liberty was relieved of any duties under the agreement because Klesch had breached and repudiated it. The counterclaim also sought damages for fraud and negligent misrepresentation based on the allegation that Klesch falsely stated during the negotiations for the June 7 agreement that it intended to honor its obligation under that agreement to negotiate in good faith.

The jury rejected Klesch's claims of breach of fiduciary duty, fraud, negligent misrepresentation, tortious interference with economic advantage, and misappropriation. It found in favor of Klesch on its claims that Liberty breached its contract by contacting Telekom before June 30, 2001, and by negotiating with Telekom toward the acquisition of the six regional companies; but it accepted Liberty's affirmative defenses of estoppel, impossibility and frustration, waiver, and accord and satisfaction with respect to these claims. The district court later rejected Klesch's equitable claims for promissory estoppel and unjust enrichment.

## II.    ANALYSIS

Klesch's appeal rests on challenges to three jury instructions: (1) an instruction that the jury could not award damages to Klesch under the June 7 agreement, (2) a misappropriation instruction, and (3) a causation instruction.

## A. Excluding Damages Under the June 7 Agreement

Klesch's first challenge is to the district court's instruction to the jury that Klesch "cannot recover damages under the June 7, 2001 agreement." Aplt. App. Vol. V at 1600. This instruction followed from the court's ruling on a motion Liberty presented under Fed. R. Civ. P. 50 after the close of evidence to preclude Klesch from recovering such damages. The court granted the motion on three grounds: (1) that Klesch had not pleaded a claim for damages under the June 7 agreement in either its complaint or the pretrial order; (2) that Klesch had presented no evidence that it had suffered damages from breach of the June 7 agreement; and (3) that Klesch could not both argue that the June 7 agreement was invalid and seek damages under that same agreement. We need not consider the latter two grounds because we affirm on the first.

We note at the outset that Klesch made no motion at trial to amend its complaint or the pretrial order. Its contention is simply that the existing pretrial order permitted it to claim damages under the June 7 agreement. We review the district court's interpretation of the pretrial order for abuse of discretion. *See Koch v. Koch Indus., Inc.*, 203 F.3d 1202, 1219 (10th Cir. 2000) ("This court reviews for abuse of discretion a district court's exclusion of evidence or issues

from trial on the basis of a properly-drawn, detailed pretrial order."); *Tyler v. City of Manhattan*, 118 F.3d 1400, 1403 (10th Cir. 1997) ("[T]he district court is in the best position to interpret its pretrial order.").

We hold that the district court acted well within its discretion in ruling that the pretrial order did not include any claim by Klesch for damages under the June 7 agreement. Indeed, Klesch's consistent position had been that the agreement was unenforceable.

The sole mention in the complaint of the June 7 agreement is in the following paragraph:

> In the evening of June 7, 2001, after considerable but futile efforts to convince Liberty Media to act in good faith and to honor its fiduciary obligations, [Klesch] signed a "non-binding" term sheet which set forth the terms dictated by Liberty Media (the "June 7 Term Sheet") in an effort to avoid losing all of the benefits of the partnership opportunity Klesch had devoted so much effort to acquiring. The June 7 Term Sheet, which Klesch signed under threats from Liberty Media, provided that Liberty Media would negotiate in good faith the terms of a final agreement between Klesch and Liberty Media and, failing such agreement, would pay Klesch, upon consummation of the Six Regions acquisition, an amount far less than its rightful share. Liberty Media has utterly failed and refused to negotiate with Klesch in good faith.

Aplt. App. Vol. I at 48–49. To be sure, the final sentence might be read to suggest that Klesch is claiming damages for breach of the June 7 agreement; but the force of the paragraph is to undermine the agreement by asserting that Klesch's consent to it was coerced. This assertion anticipated Liberty's defense that the June 7 agreement freed it from obligations under preceding agreements.

-10-

Indeed, Klesch's reply to Liberty's counterclaim denied Liberty's allegation that "the June 7 Letter Agreement is a valid and enforceable contract between Liberty Media and Klesch & Company, and is binding in accordance with its terms," *id.* at 82, and its ninth affirmative defense was, "Liberty Media fraudulently induced Klesch to sign the June 7 Term Sheet," *id.* at 94.

In any event, the complaint was superseded by the pretrial order. "[T]he pretrial order is the controlling document at trial." *Smith v. Aztec Well Servicing Co.*, 462 F.3d 1274, 1285 (10th Cir. 2006); *see* Fed. R. Civ. P. 16(e). And the pretrial order certainly includes no claim for damages under the June 7 agreement. In a section entitled "Plaintiff Klesch's Statement of Claims and Defenses," the order states that Klesch claims that its agreement with Liberty entitled it to participate as an "equal partner" rather than "merely an investor" in the acquisition of the German companies. Aplt. App. Vol. I at 98. It then characterizes the partnership as follows:

> The partnership and its terms are evidenced *in the conduct of the parties and in numerous communications and agreements between Klesch and Liberty Media during the winter and early spring of 2001*, including, but not limited to a February 11, 2001 email from Liberty Media president Robert Bennett to Mr. Klesch, a February 21, 2001 confidentiality agreement between Klesch and Liberty Media, a February 22, 2001 letter of intent ("LOI") among Klesch, Liberty Media and Telekom, and a March 16 letter agreement and term sheet between Klesch and Liberty Media.

*Id.* (emphasis added). The list of "communications and agreements" does not include the June 7 agreement; and June 7, 2001, is well outside the stated time

-11-

period: "the winter and early spring of 2001." *Id*. Nor is there any mention elsewhere in this section of a possible claim by Klesch for damages under the June 7 agreement. On the contrary, the sole mention of that agreement is in the penultimate sentence, which states: "The June 7 term sheet was the product of Liberty Media's fraudulent and fiduciary misconduct and therefore Liberty Media has no right to recover any amounts with respect to that misconduct." *Id*. at 102. As the district court observed in support of its ruling, "[I]f Klesch was taking the position that somehow it reserved the right to seek damages under the June 7 agreement, it would have to somehow affirmatively say that in the final pretrial order because in other portions, it's saying that the June 7 agreement in effect was entered under duress." Aplt. App. Vol. V at 1583.

Only after the district court asked for supplemental briefing on September 8, 2005, about two weeks into the four-week trial, did Klesch suggest that it might have a claim under the June 7 agreement. The court had apparently requested "a memorandum and jury instructions clarifying the parties' positions on (I) the June 7 Letter Agreement as a defense for [Liberty] . . . and (ii) the interaction of [Klesch's] defenses to the June 7 Letter Agreement." Aplee. Supp. App. Vol. I at 84–85 (Def.'s Supp. Mem. Concerning the June 7 Letter Agreement as a Defense, Sept. 13, 2004). Both Liberty and Klesch responded to this request on September 10. Klesch's memorandum reiterated its position that the evidence would "permit a jury to conclude that defendants are wrong that the June 7 letter

-12-

agreement is a defense to any part of Klesch's claims." *Id.* at 80. But it also contained a paragraph suggesting that the jury could conclude that the June 7 agreement was binding and contained obligations upon Liberty that "provide[d] a basis for recovery for Klesch." *Id.* at 81. Liberty promptly filed a memorandum opposing such a claim for recovery, setting forth the three grounds upon which the district court later relied in granting Liberty's Rule 50 motion to reject the claim.

Strangely, even in closing argument to the jury, Klesch did not claim that it was entitled to damages under the June 7 agreement. Thus, it is understandable that when Liberty moved under Rule 50 to preclude Klesch from recovering under the June 7 agreement, the district court initially expressed surprise, stating that it had "absolutely heard nothing, particularly since [hearing Klesch's] closing, that suggests that [Klesch] is seeking damages based on the June 7 agreement." Aplt. App. Vol. V at 1575.

Accordingly, we see no abuse of discretion here. The district court could properly have decided that the pretrial order did not include a claim by Klesch for damages under the June 7 agreement. Klesch argued in its reply brief in this court that Liberty would not have been prejudiced by trying that claim, but that was too late to raise this argument. We do not ordinarily consider arguments raised for the first time in a reply brief. *See United States v. Hall*, 473 F.3d 1295, 1301 n.1 (10th Cir. 2007). And we can hardly infer that Liberty would not have

been prejudiced when it has had no occasion to proffer evidence regarding the alleged damages from breach of the June 7 agreement.

Klesch also appears to contend that the district court's instruction prevented the jury from any consideration of the June 7 agreement in assessing Klesch's claims. For instance, it seems to argue that the instruction precluded the jury from finding that Liberty had fraudulently induced Klesch to sign the June 7 agreement. But the court's instruction was not so broad. It said: "[Klesch] cannot recover damages under the June 7, 2001 agreement." Aplt. App. Vol. V at 1600. The instruction precluded the jury only from awarding Klesch contractual damages under the June 7 agreement. It did not preclude Klesch's fraud claim or reference to the agreement in assessing that claim. We presume that juries follow the court's instructions as given. *See Questar Pipeline Co. v. Grynberg*, 201 F.3d 1277, 1287 (10th Cir. 2000). We find no error in the instruction.

**B. Misappropriation**

The district court instructed the jury on Klesch's misappropriation claim as follows: "A misappropriation has occurred when one either wrongfully profits from another's expenditure of labor, skill or money, or capitalizes wrongfully on commercial values earned over a period of time." Aplt. App. Vol. VI at 1790. Klesch objected at trial and proposed an alternative instruction that did not require Liberty to have benefitted from the misappropriation: "A misappropriation has occurred if a party uses the business value created by

-14-

another to profit itself *or if it intentionally exercised dominion or control over an opportunity created or obtained by another through the expenditure of the other's own time, labor, skill, or money.*" Aplt. App. Vol. I at 151.22 (emphasis added). Klesch noted that it was seeking an instruction "from conversion cases." Aplt. App. Vol. V at 1386.

The district court based its instruction on *Heller v. Lexton-Ancira Real Estate Fund, Ltd.*, 809 P.2d 1016, 1021 (Colo. Ct. App. 1990), *rev'd on other grounds*, 826 P.2d 819 (Colo. 1992), which stated, "We view the tort of 'unfair misappropriation' as occurring when one either wrongfully profits from another's expenditure of labor, skill or money, or capitalizes wrongfully on commercial values earned over a period of time." Klesch attempts to distinguish this case from *Heller* by observing that "*Heller* involved profits allegedly gained and lost through improper competition," and is therefore not in point. Aplt. Reply Br. at 30. But *Heller* addresses "unfair misappropriation" generally. *See Heller*, 809 P.2d at 1020–21. The opinion in no way suggests that its description of the tort is confined to a particular context. It is irrelevant that the facts in that case are not identical to the facts here.

In contrast, the opinion on which Klesch relies, *Solar Systems & Peripherals, Inc. v. Burress (In re Burress)*, 245 B.R. 871 (Bankr. D. Colo. 2000), did not attempt in any way to define the tort of unfair misappropriation. The issue before the court in *Burress* was whether a debt was nondischargeable

because it was incurred as a result of intentional wrongdoing. The court wrote: "The facts admitted to by the Debtor establish that he misappropriated business opportunities for his benefit to the detriment of his employer, effectively a conversion. What must now be determined by this Court, is whether it was done with intent to injure the Plaintiff." *Id*. at 880. But this sentence does not purport to state the elements of misappropriation. Instead, it was merely a description of the misconduct as an introduction to the analysis of the tortfeasor's intent. Even more clearly inapposite are Klesch's citations to Restatement (Second) of Torts §§ 222A and 227, which discuss the tort of conversion, not misappropriation.

In essence, what Klesch sought was an instruction on conversion. But because its claim was always for misappropriation, not conversion, this argument is unavailing. There was no error in the misappropriation instruction.

## C.    Causation

The theory of damages set forth by Klesch in the pretrial order was that it was entitled to the value of the opportunity that Liberty had wrongfully expropriated when it pursued alone the acquisition of the German cable companies. The pretrial order stated that Klesch would base its claim for damages on the value of its opportunity at the time of the expropriation. In closing argument Klesch alleged that the expropriation occurred in May or June 2001.

At trial Klesch's expert testified to the price "a willing buyer would pay a willing seller" for the right to Klesch's share of the future Telekom deal as of May 2001. Aplt. App. Vol. III at 931. The expert did not adjust his calculations for the possibility that the deal might not conclude; instead, he stated that he had assumed that the deal would be consummated and that the jury needed "to recognize and to make an adjustment for the reality which is that as of May 2001, nobody knew for sure whether the deal would have gone through." *Id.* Thus, Klesch's computation of damages would not be affected by whether the deal with Telekom was ultimately approved by the German Cartel Office. Instead, the possibility of the Cartel Office's disapproving the acquisition would have been factored into the assessment in May 2001 of the value of Klesch's interest.

Klesch nevertheless complains that the jury instruction on causation required the jury to deny recovery on the ground that the deal later fell through. The challenged instruction was as follows:

> The word "cause" as used in these instructions means an act or failure to act that in natural and probable sequence produced the claimed injury. It is a cause without which the claimed injury would not have happened.
> If more than one act or failure to act contributed to the claimed injury, then each act or failure to act may have been a cause of the injury. A cause does not have to be the only cause or the last or nearest cause. It is enough if the act or failure to act joins in a natural and probable way with some other act or failure to act to cause some or all of the claimed injury. Thus, if the defendant's act or failure to act substantially contributes to an injury, it is a cause of that injury, even though other factors, including factors beyond the defendant's control, may also have contributed to the claimed injury.

-17-

*The defendants' conduct is not a substantial contributing cause in bringing about harm to the plaintiff if the harm would have been sustained even if the defendant had not committed the wrongful act.* The plaintiff must prove that the defendant's conduct is a substantial contributing cause of the injury.

One's conduct is not a cause of another's injuries, however, if in order to bring about such injuries, it was necessary that his or her conduct combine or join an intervening cause that also contributed to cause the injuries. An intervening cause is a cause that would not have been reasonably foreseen by a reasonably careful person under the same or similar circumstances.

Aplt. App. Vol. VI at 1795 (emphasis added).

Klesch takes issue with the instruction's statement that "[t]he defendants' conduct is not a substantial contributing cause in bringing about harm to the plaintiff if the harm would have been sustained even if the defendant had not committed the wrongful act." *Id.* This is a straightforward statement of but-for causation. Klesch argues, however, that under Colorado law, "conduct can be a substantial cause even where the harm would have happened anyway if the defendant's actions as well as the other causal forces would have each been sufficient to bring about the harm." Aplt. Br. at 35. It points to a classic example from tort law: when a negligently caused fire and a lightning-caused fire combine and burn down a house, both are causes of damage to the house and the tortfeasor who started one of the fires is liable, even if either fire would have been sufficient to cause the same damage. *See* Restatement (Second) of Torts § 432 cmt. d, illus. 4.

-18-

We understand Klesch to analogize the two fires to two causes of harm in this case: (1) Liberty's expropriation of Klesch's opportunity for the deal with Telekom, and (2) the German Cartel Office's rejection of that deal. Klesch seems to be suggesting that the causation instruction improperly told the jury to deny recovery for the expropriation if the Cartel Office's rejection meant that Klesch would have gained nothing anyway. Perhaps this argument would have made sense if Klesch had been seeking damages equal to what it would have gained had the deal gone through. But that was not what Klesch sought. The argument is inconsistent with Klesch's damages theory, which was the theory conveyed by the court's unchallenged instructions to the jury on damages. In particular, the jury was told that events after Liberty's misconduct were irrelevant. Instruction No. 58 said:

> Any damages suffered by Klesch & Company became fixed at the time of Liberty Media's wrongful conduct. If you find for Klesch & Company on any of its claims, you must determine the amount of damages suffered by Klesch & Company as of the time of the breach or other misconduct. *Events taking place subsequent to the time of the breach are not generally relevant to the calculation of damages.*

Aplt. App. Vol. VI at 1794 (emphasis added). The jury was similarly instructed that "Loss of [Klesch's] property or assets caused by [Liberty's] misconduct . . . are determined by the fair market value of the asset at the time of the loss. The fair market value is the price at which the property or asset would change hands between a willing buyer and a willing seller." Instruction No. 57, *id.* at 1793.

Klesch's damages were thereby fixed as of May (or possibly June) 2001. The Cartel Office's rejection of the deal would have no effect on the damages calculation. That rejection occurred well after June 2001, and the fact of the rejection could not change the probability as of May or June 2001 of the deal's rejection. Accordingly, the jury, if it complied with the court's instructions, could not have denied Klesch recovery based on the action of the Cartel Office. (No one has contended, or could contend, that the rejection was certain at the time of the alleged expropriation.) Although the causation instruction may have been flawed (we need not decide the issue), we are confident that the flaw alleged by Klesch could not have affected the verdict.

## III. CONCLUSION

The district court's judgment is AFFIRMED.

ENTERED FOR THE COURT

Harris L Hartz
Circuit Judge